# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| MARVIN LYNN HILDRETH, JR., | |
| Plaintiff, | No.  C23-4010-LTS |
| vs. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CHAD SHEEHAN, *et al.*, | |
| Defendants. | |

## I.     INTRODUCTION

This case is before me on a motion (Doc. 138) for summary judgment filed by defendants Chad Sheehan, Todd Harlow, Randy Uhl, Mary Feiler, Willis Strawn, Steve Pickering, Katelyn Speed, Carlos Lucero, Marinus Jorgensen, Devin Amick,[1] Jennifer Wersal and Cara Newman.  Plaintiff Marvin Hildreth has filed a resistance (Doc. 147) and the defendants have replied (Doc. 153).  Oral argument is not necessary.  *See* LR 7(c).

## II.     PROCEDURAL HISTORY

I recounted the early procedural history of this case in my order (Doc. 159) denying Hildreth's second motion for leave to file an amended complaint.  I have chosen to treat four documents (Doc. 1-1, 3, 3-1 and 17) as Hildreth's complaint and later allowed him to add a claim against Cara Newman in her individual capacity.  Doc. 159 at 1-2.  Hildreth brings this case under 42 U.S.C. § 1983, alleging that the defendants violated his constitutional rights.

---

[1] There have been spelling inconsistencies regarding the names of Jorgensen and Amick.  I will use the versions appearing most frequently.

Because there had been uncertainty regarding the claims and parties involved, I directed the parties to file a joint status report identifying which claims remained pending against which defendants. Doc. 160. In that status report (Doc. 163), the parties agreed that the following claims remained against the following defendants in their individual capacities only:

- Count 1: A free exercise claim against Newman for allegedly denying Hildreth access to his religious providers and against Strawn and Harlow for allegedly denying him access to his religious providers and a religious book. *Id.* at 1-2.

- Count 2: A mail claim against Uhl, Harlow, Speed, Amick, Feiler and Strawn. *Id.* at 2.

- Count 3: A retaliation claim against Sheehan, Harlow, Uhl, Feiler, Strawn, Pickering, Speed, Lucero, Jorgensen and Wersal. *Id.* at 2-3.

- Count 4: A failure to protect claim against Pickering and Strawn. *Id.* at 3.

- Count 5: A failure to train and supervise claim related to failure to protect against Harlow, Sheehan, Uhl, Feiler, Jorgensen, Lucero and Wersal. *Id.*

- Count 6: a failure to train and supervise claim related to mail allegations against Sheehan, Harlow, Uhl, Feiler, Lucero, Jorgensen and Wersal. *Id.* at 4.

The parties dispute whether a failure to train and supervise claim related to retaliation allegations exists against Sheehan, Harlow, Uhl, Feiler, Lucero, Jorgensen and Wersal.[2] *Id.* Trial is scheduled to begin September 28, 2026.

---

[2] I need not address this dispute because, as I will discuss below, Hildreth has failed to exhaust any of his claims. Additionally, in my order (Doc. 160) directing the parties to file a status report, I stated that "all claims and parties added in Doc. 17 remain part of this case unless explicitly dismissed in a *subsequent* order." *Id.* at 1 (emphasis added). The initial review order (Doc. 5) dismissed claims against the defendants in their official capacities. Doc. 50 at 1-2. Hildreth's motion (Doc. 17) to amend attempted to add in several official capacity claims. These

2

### III. APPLICABLE STANDARDS

#### A. Motion for Summary Judgment

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the district

---

claims do not appear to have been explicitly dismissed in a subsequent order but also fail because he did not administratively exhaust them.

court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

### B. Section 1983 Claims

Hildreth brings his claims under 42 U.S.C. § 1983, which provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

4

Section 1983 was designed to provide a "broad remedy for violations of federally protected civil rights." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 685 (1978). However, 42 U.S.C. § 1983 provides no substantive rights. *See Albright v. Oliver*, 510 U.S. 266, 271 (1994); *Graham v. Conner*, 490 U.S. 386, 393-94 (1989); *Chapman v. Hou. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979). "One cannot go into court and claim a 'violation of [42 U.S.C.] § 1983' — for [42 U.S.C.] § 1983 by itself does not protect anyone against anything." *Chapman*, 441 U.S. at 617. Rather, 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; *see also Albright*, 510 U.S. at 271 ("Section 1983 'is not itself a source of substantive rights, but merely provides "a method for vindicating federal rights elsewhere conferred." (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)); *Graham*, 490 U.S. at 393-94 (same); *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) ("Constitution and laws" means 42 U.S.C. § 1983 provides remedies for violations of rights created by federal statute, as well as those created by the Constitution.). To state a claim under 42 U.S.C. § 1983, a plaintiff must establish: (1) the violation of a right secured by the Constitution or laws of the United States and (2) the alleged deprivation of that right was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

## IV.   RELEVANT FACTS

Unless otherwise noted, the following facts are undisputed for purposes of the defendants' motion:

### A.   *Hildreth's Claims*

Hildreth was booked into the Woodbury County Jail (the Jail) on May 31, 2021, at which point he received access to the Inmate Rule Book. Doc. 138-1 at 2, 11 ¶¶ 7, 61. He remained at the Jail until entering the Iowa Department of Corrections on June

13, 2022, to serve consecutive prison terms of five and ten years. *Id*. at 2 ¶¶ 10-11. Hildreth remains incarcerated at Clarinda Correctional Facility.[3]

While Hildreth was at the Jail, the defendants held these roles: Chad Sheehan was the Woodbury County Sheriff and Captain Todd Harlow was the Jail Administrator. *Id*. at 1 ¶¶ 1-2. Lieutenants Mary Feiler and Randy Uhl led the Jail's shifts. *Id*. ¶ 3. Sergeants Carlos Lucero, Marinus Jorgensen and Jennifer Wersal were supervisors. *Id*. ¶ 4. Willis Strawn, Katelyn Speed, Devin Amick and Steve Pickering were correctional officers and Cara Newman was an administrative assistant at the front desk. *Id*. at 2 ¶¶ 5-6. All defendants other than Newman and the correctional officers held supervisory responsibilities. Doc. 149 at 1-2 ¶¶ 1-8. Further, at all relevant times, the defendants acted as state actors and under the color of state law. *Id*. at 3 ¶ 14.

### 1. *Free Exercise Claims*

#### a. *Clergy Visit Denials*

The Jail provided inmates access to several clergy members. Doc. 138-1 at 5 ¶ 23. Inmates could also visit with their personal clergy if the clergy contacted the Jail for approval and inmates placed the clergy on their visiting list. *Id*. Pastors Wayne Bahr and Joshua Nink were on Hildreth's visiting list and the Jail recognized them as his personal clergy.[4] Doc. 149 at 3 ¶ 17.

Bahr attempted to visit Hildreth on November 24, 2021. *Id*. ¶ 18. Newman rejected Bahr's visit request because she believed other inmates would not be able to see their clergy due to a shortage of video monitors. *Id*. ¶ 19. Newman also rejected the request because Nink had recently visited Hildreth and Newman incorrectly believed

---

[3] The Iowa State Offender Locator may be accessed online at: https://doc-search.iowa.go v/offender/search. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (addressing court's ability to take judicial notice of public records).

[4] The parties have not identified Hildreth's religion or his pastors.

inmates could have visits from only one clergy member. Doc. 138-1 at 6 ¶¶ 24-26. After Hildreth submitted a grievance about the denial of Bahr's visit, Feiler spoke with Newman and explained that both Bahr and Nink could visit Hildreth. *Id.* ¶ 25. Fieler informed Hildreth that Bahr could visit him even if he also received visits from another pastor. *Id.* No one prevented Bahr from visiting again, but Bahr stopped visiting Hildreth citing the travel time and his uncertainty about whether he would get to meet with Hildreth. *Id.* ¶¶ 25-26; Doc. 149 at 4 ¶ 22.

On November 29, 2021, Nink emailed Harlow and asked whether both he and Bahr could minister to Hildreth. Doc. 138-1 at 6 ¶ 27. Harlow attempted to respond that day to state that they could both meet with Hildreth, but he failed to send the response. *Id.* ¶ 28. Harlow did not discover his error until January 13, 2022, when the Ombudsman asked about the visits. *Id.* ¶ 29; Doc. 149 at 5 ¶ 25. Harlow responded to Nink that day. Doc. 138-1 at 6 ¶ 29.

Although Nink requested that he be able to visit Hildreth in person, the Jail allowed only video visits. Doc. 149 at 4 ¶ 25. On January 25, 2022, Nink attempted to visit Hildreth in person but Jail staff turned him away because the attorney visiting rooms and public visiting space were occupied and another inmate had broken the visiting kiosk headset. Doc. 138-1 at 7 ¶ 30. After learning about this, Uhl contacted Nink and offered to help him reschedule a visit the next day. *Id.* ¶ 31. Nink was unavailable on January 26, 2022, but planned on coming on January 27, 2022. *Id.* Uhl gave Nink his cell phone number and asked that he call ahead to ensure space would be available. *Id.* Uhl informed Hildreth about what had happened, telling him that Nink would be able to visit on January 27 and that staff had placed a work order to fix the headset. *Id.* In an email, Nink described the Jail staff as uncooperative.[5] Doc. 149 at 4 ¶ 24; Doc. 147-1 at 70.

---

[5] Nink wrote that staff had turned him away at least once but could not provide specific dates. Doc. 147-1 at 70.

### b.    The *"Starting Point"* Book

The Rule Book outlines the Jail's policy regarding books for inmates.  Doc. 138-1 at 7 ¶ 34.  Each Wednesday, an inmate can receive two soft-cover books.  *Id.*  Inmates may keep only two books in their cell at one time.  *Id.*  The two-book limit aims to prevent book hoarding, limit the scope of property that officers must search and control fire hazards.  Doc. 138-1 at 8 ¶ 37.

On November 18, 2021, Hildreth filed a grievance in which he claimed that his family brought him a religious book, "Starting Point,"[6] on Wednesday, November 17, 2021.  *Id.* at 7 ¶ 35.  He alleged that Jail staff failed to deliver the book to him.  *Id.*  Feiler responded to his grievance that same afternoon.  *Id.* at 8 ¶ 36.  Feiler stated that when staff delivered books the day before, Hildreth had received two books.  *Id.*  She further explained that he could choose to exchange it for one of the books in his cell the following Wednesday.  *Id.*

### 2.    *Legal Mail Claim*

The Rule Book stated the following regarding mail:

> Privileged correspondence, if so marked, may be opened and inspected (but not read[]) in your presence for security precautions and to detect the presence of contraband.  Privileged correspondence is defined as mail to or from your Attorney, Judge, Governor of Iowa, Citizen's Aid Office, a member of the State or Federal Legislature and the Courts.

Doc. 138-1 at 4 ¶ 18.  On November 19, 2021, Hildreth filed a grievance asking, "Why is all of my [attorney] mail . . . opened and gone through before I can [receive] it?"  *Id.* at 5 ¶ 20.  Uhl responded to the grievance and discussed it with Hildreth.  *Id.* ¶ 21.[7]  Uhl

---

[6] The nature of this book is unclear from the record.

[7] In his declaration (Doc. 138-2 at 83), Uhl states that "the facts set forth in paragraph 10 are true and correct to the best of my knowledge and belief."  In the original motion (Doc. 25) for summary judgment, the facts now set forth in ¶ 21 were in ¶ 10.  *Id.* at 3; Doc. 138-1 at 5 ¶ 21.  Hildreth has not objected to this erroneous citation.  Doc. 147-2 at 7.  Further, Hildreth admits part of ¶ 21, without specifying which parts.  *Id.*  However, he contends his legal mail came to

"explained that officers open legal mail in the presence of the inmate and give them the mail." *Id.* After Uhl asked Hildreth to explain what happened, Hildreth "told him officers were opening his mail in front of him, and he didn't know they could do that." *Id.* Uhl then responded to Hildreth's grievance in writing, stating "As explained in our [face-to-face] meeting[,] Officers open legal mail in the presence of inmates and hand them the mail." Doc. 138-2 at 82.[8]

### 3. *Retaliation*

A searchable database catalogs each incident causing jail staff to place an inmate in segregated housing (lockdown) at the Jail. Doc. 138-1 at 3 ¶ 16. During Hildreth's time at the jail, he spent time in lockdown five times. *Id.* Each of these times, he had committed an act prohibited by the Rule Book.[9]

First, on June 24, 2021, he spent 22 hours in lockdown after he assaulted another inmate – a class 1 disciplinary action. Doc. 138-1 at 3-4 ¶ 16(a); Doc. 138-2 at 77. This behavior led to a criminal charge for assault (to which Hildreth pleaded guilty) and Jail disciplinary action.[10] *Id.* Second, on July 5, 2021, Jail staff found he violated Jail rules during the assault and placed him in lockdown for 15 days, with credit for one day served on June 24, 2025. Doc. 138-1 at 4 ¶ 16(b). Third, on July 22, 2021, he spent 22 hours

---

him already opened without citing evidence in the record. *Id.* Because he has failed to provide support, I deem him to have admitted ¶ 21 in full. LR 56(b).

[8] In the facts section of his resistance (Doc. 147), Hildreth misrepresents this response, claiming Uhl told him that the Jail's policy allowed staff to open legal mail outside the presence of inmates. *Id.* at 4.

[9] In their brief, the defendants claim that these acts violated the Inmate Rule Book, but fail to cite support or include it in their statement of material facts. Doc. 139-1 at 22-23. However, the information is available in their appendix. *See* Doc. 138-2 at 77-81.

[10] Hildreth does not contest the factual basis of his June 24 and July 5, 2021, lockdowns, but incorrectly ties them to an event occurring on July 22, 2021. Doc. 147-2 at 5-6.

9

in lockdown for fighting with another inmate – a class 2 disciplinary action.[11]  Doc. 138-1 at 4 ¶ 16(c); Doc. 138-2 at 36, 78.  Fourth, on August 24, 2021, he spent 22 hours in lockdown "for talking through the fire door after having been warned to stop."  Doc. 138-1 at 4 ¶ 16(d).  Refusing to obey an order issued by a staff member is a class 3 disciplinary action.  Doc. 138-2 at 79.  Finally, on December 11, 2021, he spent 22 hours in lockdown after he helped an inmate send text messages using a third inmate's account.[12]  Doc. 138-1 at 4 ¶ 16(e).  Sending unauthorized mail through a third party is a class 4 disciplinary action.  Doc. 138-2 at 80-81.

### 4.  Failure to Protect

On July 22, 2021, Hildreth occupied a second-floor cell in the Jail's F Block.  Doc. 138-1 at 8-9 ¶¶ 38, 43, 46.  The Jail locked down F Block's floors at alternating times.  *Id.* at 9 ¶ 47.  At 8:30 pm, first-floor inmates were free to move about while second-floor inmates were on lockdown.  *Id.* at ¶¶ 46-47.  At that time, a first-floor inmate, Cedric Lawson, requested a plunger to unclog a sink or toilet.  *Id.* at 8 ¶ 38; Doc. 149 at 7 ¶ 49.[13]  Because of longstanding plumbing issues at the Jail, inmates frequently asked staff for plungers.  Doc. 138-1 at 8 ¶ 39.  When an inmate requested a plunger, staff would bring a plunger to the section and provide the inmate with a plunger at the door.  *Id.* ¶ 40.  Once the inmate had finished using the plunger, the inmate would place it by the door and an officer would remove it.  *Id.* ¶ 41.  Before that night, the Jail

---

[11] Hildreth admits the factual basis, but contends that the incident would not have occurred if staff did not open his cell door for another inmate, which I will discuss below.  Doc. 147-2 at 6.

[12] Hildreth failed to respond to this statement.  Doc. 147-2 at 6.  Therefore, it is admitted.

[13] Although Hildreth did not support his assertion that Lawson was not on lockdown, the defendants have admitted this assertion.  Doc. 153-1 at 6 (admitting the second ¶ 49).

had never had issues addressing plumbing problems by providing inmates plungers. *Id.* ¶ 42.

When Lawson requested a plunger, Blanchard and Strawn met Lawson at the F Block door. *Id.* at 9 ¶ 43. After Blanchard unlocked the door, Strawn handed a plunger to Lawson. *Id.* ¶ 44. Lawson then raced toward Hildreth's cell on the locked top tier. *Id.* ¶¶ 45-46. Once Lawson approached Hildreth's cell, Blanchard radioed the Control Center to unlock the door. *Id.* ¶ 48; Doc. 149 at 7 ¶ 49. Shortly after Lawson entered the cell, Blanchard realized that Lawson and Hildreth were fighting inside. Doc. 138-1 at 9 ¶ 49. Once Blanchard noticed the fight, he and Strawn radioed Central Control, asking that it send more officers to F Block and lockdown the entire section. *Id.* ¶ 50.[14] After Strawn threatened the two with a pepper ball gun, they stopped fighting. Doc. 138-1 at 9 ¶ 51.[15] The fight lasted roughly 45 seconds. Doc. 147-1 at 2 (0:00:35-0:01:20). In his incident report, Blanchard stated that Lawson appeared to be the aggressor during the fight. Doc. 149 at 7 ¶ 58.[16]

After the fight, Blanchard removed Lawson from F Block. Doc. 138-1 at 10 ¶ 52. A Jail nurse examined Hildreth and noted that he had a split lower lip. *Id.* ¶ 53. The nurse believed the split needed to be glued shut but did not have glue. *Id.* Strawn

---

[14] Hildreth denies that Blanchard radioed Central Control once he saw the fight, but the material cited by Hildreth does not controvert this fact. *See* Doc. 147-2 at 13; Doc. 147-1 at 2 (citing to the video).

[15] Hildreth contests this fact because Strawn's account is not shown on the video Hildreth has provided. Doc. 147-2 at 13. The video does not contradict Strawn's account because it has no sound and shows only a narrow section of F Block, meaning that Strawn might have acted off-screen. *See* Doc. 147-1 at 2. Further, although the defendants provided the video to Hildreth during discovery, it was one of at least 15 videos they provided and he did not produce it alongside his resistance. Doc. 153-1 at 7 ¶¶ 54-56. Therefore, I will consider the video only to the extent that it shows the duration of the fight.

[16] The defendants deny this assertion, correctly noting that the cited materials do not support it. Doc. 153 at 7 ¶ 58. However, the information is on the page after the citation Hildreth provided. Doc. 147-1 at 75.

and Pickering took Hildreth to the emergency room. *Id.* ¶ 54. The doctor examined Hildreth and discharged him without providing any additional treatment. *Id.*

The Jail investigated the fight. When inmates enter the Jail, staff screen them to determine proper housing assignments, including whether they need to be separated from other inmates. *Id.* at 10 ¶ 57. If an inmate feels his housing assignment is unsafe, staff investigate the circumstances and relocate the inmate if necessary. *Id.* ¶ 58. On June 26, 2021, Hildreth had filed a grievance asking to move to either the bottom tier of F Block or to E Block, citing issues he had with his cellmate and unspecified inmates. Doc. 147-1 at 86. The Jail responded by noting that he had already been moved once and stating the Jail would not move him to E Block but could move him to B Block. *Id.* Hildreth declined to move. *See id.*

In September 2020, Lawson had been involved in a fight in E Block. Doc. 149 at 7 ¶ 50; Doc. 153-1 at 7 ¶ 50. However, there is no evidence that Lawson and Hildreth had issues with one another, had prior incidents with one another or had ever requested that staff separate them. Doc. 138-1 at 11 ¶ 59. In fact, when Strawn asked Hildreth what had caused the fight, Hildreth stated he did not know and that he had no issues with any other inmates. *Id.* ¶ 60.

## B.     *Exhaustion Under the Prison Litigation Reform Act*

The Rule Book outlines the Jail's grievance procedure. *Id.* ¶ 62. The policy states in relevant part:

> In order to be timely, a grievance must be submitted within seven calendar days of the date on which the matter which is the subject of the grievance occurred. You may submit a grievance by delivery to any member of the facility staff or Kiosk. The grievance will be given to the Captain or Lieutenant for response.

> You will receive a response to your grievance from the Captain or Lieutenant[17] within seven calendar days of submission. If you are not satisfied with the response you receive from the Captain or Lieutenant, you have seven calendar days to appeal that response to the Chief Deputy in charge of jail operations. Your appeal must be submitted in the space provided on the written response or Kiosk. The appeal will be given to the Chief Deputy for response. The Chief Deputy will respond within seven calendar days. That response will be final.

Doc. 138-2 at 76. Hildreth sent several complaints to the Iowa Office of Ombudsman, but the policy does not contemplate that an individual could administratively exhaust by appealing to an outside institution. Doc. 149 at 9 ¶ 62; Doc. 138-2 at 76.

Like all inmates, Hildreth had an inmate file at the Jail. *Id.* ¶¶ 64-65. In this file, Jail staff tracked inmate grievances and responses. *Id.* Hildreth's file indicates that he never appealed a grievance to the Chief Deputy.[18] *Id.* at ¶ 66. He did, however, label at least two grievances as appeals but did not address them to the Chief Deputy. Doc. 149 at 9 ¶ 61[19]; Doc. 147-1 at 81-82. He filed these grievances on September 11, 2021, and December 16, 2021, respectively. Doc. 147-1 at 81-82.

In the September 11, 2021, grievance, Hildreth accused the Jail of not giving him his mail, including legal mail. *Id.* at 82. Fieler responded to the grievance. *Id.* Although Hildreth labelled the grievance as an appeal, it does not state which grievance response

---

[17] Although the Rule Book stated that only lieutenants and captains responded to grievances, sergeants could also respond. Doc. 147-1 at 68.

[18] Hildreth attempts to controvert this fact by claiming that this "ignores the many complaints that [he] submitted to the Iowa Office of the Ombudsman and the fact that Jail staff, particularly Harlow, often communicated with this office." Doc. 147-2 at 16 ¶ 66. This assertion does not controvert the fact because, although he mentions other complaints, he does not claim that he submitted an appeal to the Chief Deputy. *Id.* Nor did Hildreth support his denial with a citation to the appendix. Local Rule 56(b).

[19] The defendants correctly note that the material cited in Hildreth's statement (Doc. 149) of additional material facts are not grievances. Doc. 153-1 at 9 ¶ 61. However, the grievances can be found two pages before the cited page range. *See* Doc. 147-1 at 81-82.

it intended to appeal. *Id.* In addition, Hildreth submitted this grievance two months before his November 19, 2021, grievance claiming Jail staff opened his legal mail outside of his presence. *Id.*

The December 16, 2021, appeal had two parts. Doc. 147-1 at 81. First, it stated without that "7-23-21 and 8-02-21 need removed or can[']t be used against me." *Id.* Hildreth did not state which response this appeal addressed and, in any events, the stated dates are well outside the seven-day window to timely appeal a grievance response. Doc. 138-2 at 76. The second part of the December 16, 2021, appeal contests a December 12, 2021, response to a grievance submitted on December 11, 2021. Doc. 147-1 at 81. Although neither party has provided this grievance, or the response, in context it appears that the grievance addressed the December 11, 2021, disciplinary violation for helping an inmate send text messages on a third inmate's account. *See* Doc. 138-1 at 4 ¶ 16(e).

## V.    DISCUSSION

The defendants seek summary judgment on all remaining claims. The defendants address the merits of Hildreth's free exercise claim (Count 1), mail claim (Count 2), retaliation claim (Count 3), failure to protect claim (count 4) and failure to supervise claims (Counts 5 and 6).[20] Doc. 139-1 at 12-27. Alternatively, the defendants contend they are entitled to summary judgment because Hildreth failed to exhaust any of his claims and because they are entitled to qualified immunity.[21] *Id.* at 27-33. I will address these claims and arguments in turn.

---

[20] They do not address the failure to train components. *See* Doc. 139-1 at 12-13.

[21] The qualified immunity argument addresses only Counts 1 through 4. Doc. 139-1 at 29-33.

## A. Hildreth's Claims

### 1. Free Exercise Claim

Hildreth claims that the defendants violated his free exercise rights when they denied visits by his personal pastors and prevented him from receiving the religious text, "Starting Point." Doc. 147 at 3-4, 12-13. The First Amendment's free exercise clause "prohibits the government from unduly burdening the free exercise of religion." *United States v. Slabaugh*, 655 F. Supp. 462, 463 (D. Minn. 1987), *aff'd*, 852 F.2d 1081 (8th Cir. 1988). To successfully plead a free exercise clause violation, a plaintiff must first plead facts sufficient to demonstrate that a defendant placed a "substantial burden" on the plaintiff's ability to practice his religion. *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008). A plaintiff must also show that the burden impacted a sincerely based religious belief. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015). The same standard applies to both convicted inmates and pre-trial detainees. *See Moon v. Boyd*, 727 F. Supp. 3d 829, 837, 847-49 (E.D. Mo. 2024).

The Eighth Circuit Court of Appeals has explained that an inmate-plaintiff must demonstrate "that the action substantially burdens" the inmate's ability to practice his religious beliefs. *Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997); *see also Patel*, 515 F.3d at 813. The court has defined "substantial burden" as follows:

> In order to be considered a substantial burden, the governmental action must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.

*Weir*, 114 F.3d at 820 (internal quotation marks omitted) (alterations in original). Pleading such a "substantial burden" is a threshold requirement. *Weir*, 114 F.3d at 820; *Patel*, 515 F.3d at 813.

If the plaintiff has pled a substantial burden, the court then employs the four factor *Turner* test to determine if the burden was related to a legitimate institutional goal. *See*

*West v. Palmer*, No. C14-4102, 2017 WL 3574442, at \*12 (N.D. Iowa Aug. 17, 2017) (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)). If an adequate alternative means exists for the inmate to "express adherence to [her] faith" and "engage in those activities that are fundamental to [her] religion," then there is no substantial burden on the inmate's ability to freely practice her religious beliefs. *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 832 (8th Cir. 2009) (citations omitted). The inmate "bears the burden of establishing that the correction facility has placed a substantial burden on" the inmate's ability to practice his religious beliefs. *Id.*

### a. Clergy Visit Denials

The defendants argue that they did not substantially burden Hildreth's ability to practice his religion when they denied visits from Pastors Bahr and Nink and failed to promptly respond to Nink's inquiry. Doc 139-1 at 16-18. The defendants argue that Newman's denial of one visit by Bahr because Newman misunderstood the visiting rules was not a substantial burden. *Id.* at 16-17. The defendants also argue Harlow's delay in responding to Nink did not cause a substantial burden because it did not prevent Hildreth from receiving visits from pastors in the interim. *Id.* The defendants finally argue that denying Nink's visit because of space and technology issues did not create a substantial burden when it prevented Nink from visiting with Hildreth for two days. *Id.* at 17-18.

Hildreth largely fails to address the defendants' arguments in his resistance. He argues that "things deteriorated so badly that Pastor Bahr stopped coming." Doc. 147 at 13. Further, he argues "Pastor Nink was often turned away – even after Harlow allegedly intervened. Three missed visits by Pastor Nink is not [de minimis] under law." *Id.* Although Hildreth claims that Nink missed three visits because of jail staff, the record substantiates only that Jail staff prevented two visits by the pastors: Bahr on November 24, 2021, and Nink on January 25, 2022. Doc. 138-1 at 6-7 ¶¶ 24, 30; Doc. 149 at 3, 5 ¶¶ 18-19, 27.

16

Hildreth's claim fails because he has not alleged how these short delays in visits, and two missed visits, substantially impaired his ability to practice his religious beliefs. Doc. 147 at 12-13. His claim fails for three additional reasons. First, missing two visits does not cause a substantial burden. *Gibson v. Cnty. of Cass*, No. CIV A3-97-89, 1999 WL 33283361, at *2 (D.N.D. Mar. 24, 1999) ("[B]eing excluded from religious services on four occasions and not being allowed to attend group Bible study does not substantially burden plaintiffs' religious practices."); *see also Powell v. City of New York*, No. 14CV09937, 2016 WL 4159897, at *5 (S.D.N.Y. July 14, 2016), *report and recommendation adopted*, No. 14CIV9937, 2016 WL 4147203 (S.D.N.Y. Aug. 3, 2016) ("It is well-settled in [the Second] Circuit that missing two weekly religious services does not substantially burden a prisoner's right to freely exercise his religion."). Second, even when his visits were cancelled, Hildreth still had the ability to meet with pastors from the Jail. *See Jihad v. Fabian*, No. CIV. 09-1604, 2011 WL 1641885, at *18 (D. Minn. Feb. 17, 2011), *report and recommendation adopted*, No. CIV. 09-CV-1604, 2011 WL 1641767 (D. Minn. May 2, 2011) ("the occasional cancellation of religious services" does not cause a substantial burden "so long as there are other reasonable opportunities available for practicing his religion").

Third, the Jail had a policy allowing inmates to meet with their personal clergy. Doc. 138-1 at 5 ¶ 23. The issue is not that the policy caused a substantial burden, but that the staff failed to follow the policy. "When a free-exercise claim is based not on a prison policy or regulation, but on prison staff's failure to properly implement prison policy, the inmate must submit evidence that the challenged incidents were something 'other than negligent mistakes.'" *Glenn-El v. Fluharty*, No. 1:20-CV-00194, 2022 WL 1668568, at *2 (E.D. Mo. May 25, 2022) (quoting *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1054 (8th Cir. 2020)). Hildreth has presented no such evidence.

Because Hildreth has not created a genuine dispute of material fact that the defendants substantially impaired his ability to practice his religion by denying him visits

with pastors, his free exercise claim must fail.  I therefore need not address the *Turner* factors or whether he sincerely held his religious beliefs.

### b.      *"Starting Point"*

The defendants argue that Hildreth's free exercise claim based on their refusal to provide him "Starting Point" for six days, based on the Jail's two-book policy, fails because it did not substantially impair his free exercise rights and the policy was based on a legitimate institutional goal.  Doc. 139-1 at 18-19.  The defendants note that the book policy did not discriminate against different kinds of books and that he could have exchanged one of the books in his cell for "Starting Point" the following Wednesday. *Id*. at 19.  Hildreth does not address these arguments in his resistance (Doc. 147).

On Wednesday, November 17, 2021, Hildreth received two books.  Doc. 138-1 at 8 ¶ 36.  Later that day, his family delivered "Starting Point" to the Jail.  *Id*. at 7 ¶ 35. The next day, he filed a grievance because he had not received the book.  *Id*.  Jail staff did not provide him the book when he filed his grievance on Thursday, November 18, 2021, because of the two-book limit.  *Id*. at 7, 8 ¶¶ 34, 36.  However, staff assured him he could trade one of the two books in his cell for "Starting Point" during book distribution the following Wednesday.  *Id*. at 8 ¶ 36.

I cannot find, and Hildreth has not argued, that this six-day delay in access to "Starting Point" substantially impaired his free exercise rights.  Hildreth has not argued the importance of "Starting Point" to his religious practice.  The defendants did not prevent him from having similar religious texts in his cell.  Rather, they limited him to two texts, which could have been any religious texts of his choice.  If Hildreth wanted to access "Starting Point" the following Wednesday, he could have.  *See McCroy v. Douglas Cnty. Corr. Ctr.*, 394 F. App'x 325, 325 (8th Cir. 2010) (two-week delay in returning confiscated prayer rug and Koran did not rise "to the level of a constitutional violation"); *Masek v. Chastain*, No. 4:17-CV-660, 2018 WL 4144792, at *7 (E.D. Mo. Aug. 30, 2018) (finding inmate "failed to show how not having a Bible for one week after he

18

requested one substantially burdened his ability to exercise his religion"); *Johnson v. Fields*, No. 2:14-CV-38, 2017 WL 5505991, at *13 (W.D.N.C. Nov. 16, 2017) (defendants did not substantially burden inmate's religious practice by taking his Bible for 24 days); *Neusteter v. Cossobone*, 62 F. App'x 844, 845-46 (10th Cir. 2003) (two-book limit that prevented inmate from receiving religious book did not substantially burden inmate's free exercise of religion when policy did not specify which books inmate could keep and inmate could exchange books).

Hildreth has failed to oppose the defendants' argument that the delay in receiving "Starting Point" did not substantially impair his free exercise rights. A "failure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). For these reasons, Hildreth's free exercise claim related to the denial of "Starting Point" fails.

### 2. Legal Mail Claim

The defendants argue that the officers did not implicate any constitutional right when they opened Hildreth's legal mail in his presence to "confirm that it really [was] legal mail[] and that it [did] not contain contraband." Doc. 139-1 at 20. In response, Hildreth claims that "there would be no issue" if Jail staff "opened [his] legal mail in front of him." Doc. 147 at 12. Without evidence, he claims that "staff routinely opened [his] mail *outside of his presence*." *Id*. He does not suggest staff opened his mail inadvertently. *Id*.

A prisoner retains First Amendment protections to send and receive mail, but that right may be restricted for legitimate penological reasons. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989); *Turner,* 482 U.S. at 89. "Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, [the Supreme] Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world. *Thornburgh*, 490 U.S. at

407–08. In a case concerning civilly-committed patients, who are subject to the same standards as pretrial detainees, this court observed that, "[t]he constitutional right to legal papers and to be free from interference with legal mail are closely related to the access to courts." *West*, 2017 WL 3574442, at *9 (citing *Goff v. Nix*, 113 F.3d 887, 892 (8th Cir. 1997)). Thus, "[p]rivileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner." *West,* 2017 WL 3574442, at *9 (quoting *Jensen v. Klecker*, 648 F.2d 1179, 1182 (8th Cir. 1981) (alteration in original)).

However, to survive summary dismissal, a "mail" claim must allege that an official deliberately opened confidential correspondence. *West,* 2017 WL 3574442, at *9. This is because it "is firmly established that non-prejudicial, isolated incidents, cannot give rise to constitutional claims in this context." *Id. (citing Beaulieu v. Ludeman,* 690 F.3d 1017, 1037 (8th Cir. 2012)). The Eighth Circuit has "observed that '[p]rivileged prisoner mail, that is mail to or from an inmate's attorney and identified as such, may not be opened inspections for contraband except in the presence of the prisoner.'" *Beaulieu*, 690 F.3d at 1037 (quoting *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997)). "But, 'we have never held or suggested that an isolated, inadvertent instance of opening incoming confidential legal mail will support a § 1983 damage action.' Instead, we have found that 'an isolated incident, without any evidence of improper motive or resulting interference with the inmate's right to counsel or to access to the courts, does not give rise to a constitutional violation.'" *Id.* (quoting *Gardner*, 109 F.3d at 431) (internal citations and alteration omitted).

Hildreth filed a grievance on November 19, 2021, stating officers opened his legal mail. Doc. 138-1 at 5 ¶ 20. The record demonstrates that this grievance concerned officers opening his legal mail in his presence and giving him the mail. *Id.* ¶ 21. Hildreth baldly claims that his "legal mail came to him already opened." Doc. 147-2 at 7. However, he has failed to create a genuine issue of material fact that his legal mail was open when he received it or that Jail officials ever opened his legal mail outside of his

20

presence.[22]  He relies only on his unsworn assertions, which I cannot consider at summary judgment.  *See Risdal v. Nixon,* 589 F. App'x 801, 803 (8th Cir. 2014) (per curium) (holding that court may not consider unsworn statements when ruling on a motion for summary judgment).  Alternatively, even if Hildreth had created a genuine dispute of material fact that officers had inadvertently opened his legal mail outside his presence, his claim would still fail as a matter of law.  For these reasons, his mail claim fails and must be dismissed.

### 3.    Retaliation Claim

The defendants acknowledge they placed Hildreth in lockdown.  Doc. 139-1 at 21-23.  However, they claim that this was because of his disciplinary violations, rather than to retaliate against him for filing grievances.  *Id.*  The defendants also argue that his retaliation claim fails because he was disciplined for violating Jail rules.  *Id.*

In his resistance, Hildreth includes one paragraph about retaliation in his facts section, but neglects to address retaliation in his argument section.  Doc. 147 at 6-7.  He does not address the reasons why staff placed him in lockdown or whether he had committed rule violations.  *Id.*  Rather than addressing the lockdowns, he claims that Jail staff retaliated against him by placing him in temporary housing.  *Id.* Because I have previously ruled that these temporary housing allegations were not part of his complaint, and thus denied leave to amend (Doc. 159 at 7-11), I will not address his temporary housing claims further.

Acts by prison officials may be actionable under § 1983 if conducted in retaliation for the exercise of a constitutionally-protected right, even if those acts would have otherwise been proper.  *Madewell v. Roberts,* 909 F.2d 1203, 1206 (8th Cir. 1990).

---

[22] It appears that Jail staff inadvertently opened Hildreth's mail from the Ombudsman outside of his presence.  Doc. 138-2 at 105.  However, I did not allow his claim based on a violation of Iowa Code § 2C.14 to proceed past initial review.  Doc. 5 at 9 n.3.

"Filing a prison grievance has long been 'protected First Amendment activity.'" *Spencer v. Jackson Cnty.*, 738 F.3d 907, 913 (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007)). To state a claim for retaliation, a prisoner must show that "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer*, 738 F.3d at 911 (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004); *see also Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994) (holding that threat of retaliation is sufficient injury if made in retaliation for inmate's use of prison grievance procedure). "Speculative and conclusory, or *de minimis* allegations, however, cannot support a retaliation claim." *Doering v. Reed,* No. 6:15-CV-06093, 2016 WL 3148642, at *3 (W.D. Ark. Apr. 29, 2016), *report and recommendation adopted sub nom., Doering v. Reed*, No. 6:15-CV-6093, 2016 WL 3162137 (W.D. Ark. June 3, 2016); *see also Rustan v. Rasmussen*, 208 F.3d 218 (8th Cir. 2000) (unpublished) (finding that allegations that defendants harassed and verbally threatened him in retaliation for a grievance did not form the basis of a cognizable § 1983 claim).

Hildreth potentially satisfies the first and second elements of a retaliation claim but fails to satisfy the third. First, "[f]iling a prison grievance has long been 'protected First Amendment activity.'" *Spencer*, 738 F.3d at 913 (quoting *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007)). Second, officials placing an inmate in lockdown for filing grievances might chill a person of ordinary firmness from filing grievances. However, Hildreth fails on the third element because the five times Jail staff placed him in lockdown were each in response to him committing Jail rule violations. Doc. 138-1 at 3-4 ¶ 16(a)-(e). Hildreth has admitted he committed these violations. Doc. 147-2 at 4-5. He has not created a genuine issue of material fact that the defendants placed him in lockdown for any reason other than because he had violated the rules.

"[An inmate's] retaliation claim is precluded [when] the punishment in question was imposed against him based on an actual violation of prison rules." *Earnest v.*

22

*Courtney*, 64 F.3d 365, 367 (8th Cir. 1995); *see also Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993) ("However, if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail."). Because staff placed Hildreth in lockdown after he violated Jail rules, his retaliation claim fails and must be dismissed.

### 4. *Failure to Protect Claim*

The defendants argue that Hildreth's failure to protect claim fails for two reasons. First, they assert that they did not create a substantial risk that Hildreth would suffer serious bodily harm when Strawn gave Lawson a plunger or Blanchard radioed to unlock Hildreth's door. Doc. 139-1 at 24-26. Second, the defendants claim that they were not deliberately indifferent to any risk because it was normal practice to allow inmates to use plungers. *Id.* at 26-27. They also argue that deliberate indifference did not exist because Lawson and Hildreth had never had issues with one another, had never had an incident and had never requested that staff separate them. *Id.* at 27. Finally, the defendants note that after the fight, Hildreth told Strawn that he did not know what caused the incident and that he had no issues with any other inmates. *Id.*

Hildreth argues that staff created an objectively dangerous situation when Blanchard radioed to open Hildreth's cell. Doc. 147 at 9. He argues also that Blanchard was subjectively aware of the danger he created by opening the door. *Id.* at 9-10. He argues further that the officers' response was unreasonable. *Id.* at 11. Finally, he argues that the officers were deliberately indifferent because Blanchard opened the door, Strawn had given Lawson a plunger and the officers did not respond in a timely fashion. *Id.*

"The Eighth Amendment requires officials to 'provide humane conditions of confinement' by taking reasonable steps to protect inmates convicted of crimes from assault by other inmates." *Hodges v. Dep't of Corr.*, 61 F.4th 588, 591–92 (8th Cir. 2023) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "Pretrial detainee § 1983

23

claims are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment prohibition of cruel and unusual punishment." *Holden v. Hirner*, 663 F.3d 336, 341 (8th Cir. 2011). "This makes little difference as a practical matter, though: Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." *Johnson v. Schurman*, 145 F.4th 897, 903 (8th Cir. 2025) (quoting *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007)). To succeed on his failure to protect claim, Hildreth "must show that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) a defendant was deliberately indifferent to the substantial risk of serious harm." *Johnson*, 145 F.4th at 903 (quoting *Hodges*, 61 F.4th at 592).

"[D]eliberate indifference includes something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk." *Holden*, 663 F.3d 336, 341 (8th Cir. 2011) (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir.1998)) (internal citations omitted). A prison official can be found to be deliberately indifferent only if he "knows of and disregards" a substantial risk to an inmate's safety. *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (en banc). Negligence on the part of a defendant is not sufficient to establish that he acted with deliberate indifference. *See Jackson*, 140 F.3d at 1152. In addition, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844; *see also Prater v. Dahm*, 89 F.3d 538, 541 (8th Cir. 1996) ("The duty to protect requires only that prison officials 'take reasonable measures to abate substantial risks of serious harm, of which the officials are aware.'" (*quoting Reece v. Groose,* 60 F.3d 487, 491 (8th Cir.1995))).

Here, the record contains no evidence that the defendants' conduct amounted to the recklessness required to show deliberate indifference. Even assuming that the defendants created a substantial risk that Lawson would attack Hildreth when Strawn provided Lawson a plunger and Blanchard erroneously allowed him to enter Hildreth's

24

cell, there is no evidence that the defendants subjectively knew about the risk or failed to respond reasonably. Hildreth's request to move cells in June 2021 did not show that officers knew that there were problems between Lawson and Hildreth because Hildreth had asked to move to the bottom of F block - where Lawson lived. *See* Doc. 147-1 at 86. Lawson was involved in a fight in 2020, but his "history of violence alone [was] insufficient to impute to prison officials subjective knowledge [of his] danger to harm other inmates." *Holden*, 663 F.3d at 341 (8th Cir. 2011). Further, there is no evidence that Lawson and Hildreth had issues with one another, had prior incidents with one another or had ever requested that staff separate them. Doc. 138-1 at 11 ¶ 59. In *Holden*, the Eighth Circuit determined that when the plaintiff had presented "no evidence the prison officials had any knowledge of any specific danger posed to" him by an inmate, "the evidence presented [was] insufficient to show the prison officials knew of and disregarded a known risk." 663 F.3d at 342.

Hildreth claims the following shows that Blanchard had drawn and disregarded the inference that Hildreth was in danger:

> When Blanchard opened the cell door, he knew that they were not roommates. He also knew that Lawson was assigned to the lower tier and Mr. Hildreth was on the upper tier. As such, Blanchard knew that there was no reason why Lawson would need to enter Mr. Hildreth's room. Blanchard[23] had also given Lawson a weapon – the plunger. For all of these reasons, it seems that Blanchard was indeed aware of a risk of harm.

Doc. 147 at 9-10. However, in an apparent acknowledgment that the record shows no evidence of this knowledge, Hildreth asserts that he does not need to show direct knowledge when the risks were so obvious. *Id*. at 10.

Hildreth admits that courts have frequently found officials were not deliberately indifferent when an inmate committed a surprise attack and concedes that Lawson's attack on Hildreth "was not telegraphed and appeared to be a surprise attack." *Id*. However,

---

[23] Strawn gave the plunger to Hildreth, not Blanchard. Doc. 138-1 at 9 ¶ 44.

he claims that "[w]hen prison officials open a door," the officials need not have particularized knowledge about an attack, "[they] only need[] to know (1) the jail cells were not being locked at night, and (2) leaving the cells unlocked overnight was 'an obvious, substantial risk to inmate safety.'" *Id.* (quoting *Walton v. Dawson*, 752 F.3d 1109, 1119 (8th Cir. 2014)) (alterations in original). In *Walton*, the plaintiff had been sexually assaulted by another inmate who was able to enter the plaintiff's cell "[b]ecause the jailer did not lock the cell doors at night." 752 F.3d at 1114. The jail did not ensure the cell doors were locked despite the same inmate having committed another sexual assault three months before by entering another unlocked cell. *Id.* at 1115.

Here, staff did not leave cell doors unlocked overnight. Blanchard unlocked Hildreth's cell at 8:30 pm, while staff and other inmates were in the area. Doc. 138-1 at 8, 9 ¶¶ 38, 47-48. In *Walton*, it was an obvious risk that staff leaving doors unlocked overnight could lead to sexual assault because the same inmate had sexually assaulted another inmate by entering an unlocked cell three months before. The risk that Lawson would assault Hildreth was not obvious because there is no evidence that Lawson and Hildreth had issues with one another, had prior incidents with one another or had ever requested that staff separate them. Doc. 138-1 at 11 ¶ 59. Further, the Jail had allowed inmates to fix their own plumbing issues for years without issue. *Id.* at 8 ¶¶ 39-42. Although the danger presented by leaving doors unlocked overnight was obvious in *Walton*, the danger was not obvious here. Because the danger was not obvious, there is no genuine issue of material fact on the subjective prong.

Hildreth also argues the defendants did not respond reasonably because the fight lasted nearly a minute. Doc. 147 at 11. *Id.* He asserts, despite evidence otherwise, that no guards attempted to intervene. *Id.* Finally, he argues that "once the attack began, the officers should have sprung into action immediately and their failure to do so was a constitutional violation." *Id.*

Once Blanchard noticed the fight, he and Strawn radioed Central Control, asking for more officers and a lockdown of F Block. Doc. 138-1 at 9 ¶ 50. In contrast to

Hildreth's assertion that no officers intervened, Strawn intervened when he threatened Lawson and Hildreth with a pepper ball gun, which stopped the fight. *Id.* ¶ 51. Because Strawn intervened, the fight only lasted 45 seconds. Doc. 147-1 at 2; *see also Dawson*, 752 F.3d at 1124 (characterizing as "immediate," the one-minute delay before prison officials stopped a cellblock fight in another case). Because officers intervened and stopped the fight after 45 seconds, Hildreth's argument that officers did not respond reasonably fails. For these reasons, Hildreth's failure to protect claim must be dismissed.

### 5. *Failure to Supervise Claims*

The defendants contend that Hildreth's failure to supervise claims fail because there was no underlying constitutional violation. Doc. 139-1 at 13. Alternatively, they argue that these claims fail because the defendants with supervisory responsibilities neither had notice of a pattern of unconstitutional conduct nor were deliberately indifferent to or tacitly authorized such misconduct. *Id.* Hildreth fails to respond to these arguments.

"[N]either municipalities nor government officials may be held liable for unconstitutional conduct under a theory of respondeat superior." *Rogers v. King*, 885 F.3d 1118, 1122 (8th Cir. 2018). A supervisor may be held individually liable under § 1983 if he or she directly participates in the constitutional violation or fails to train or supervise the subordinate who caused the violation. *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994). The standard of liability for failure to train is deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). The standard of liability for failure to supervise is "demonstrated deliberate indifference or tacit authorization of the offensive acts." *Wilson v. City of N. Little Rock*, 801 F.2d 316, 322 (8th Cir. 1986); *see also Brockinton v. City of Aherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007). "Under § 1983, 'a claim for failure to supervise requires the same analysis as a claim for failure to train.'" *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1216 (8th Cir. 2013) (quoting *Robinette v. Jones*, 476 F.3d 585, 591 (8th Cir.2007)). Further,

27

failure to train and supervise claims "[can]not be sustained absent an underlying constitutional violation." *Royster v. Nichols*, 698 F.3d 681, 693 (8th Cir. 2012) (quoting *Sitzes v. City of W. Memphis*, 606 F.3d 461, 470 (8th Cir. 2010)).

Although the defendants address only Hildreth's failure to supervise claims, I will also discuss his failure to train claims because they are analyzed under the same standard. The failure to train and supervise claims fail for three reasons. First, as discussed above, there were no constitutional violations to which these claims could attach. Second, there is no evidence that any of the defendants were deliberately indifferent in their failure to train or supervise the Jail staff or tacitly authorized the offensive actions. Finally, Hildreth has failed to respond to the defendants' argument and a "failure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher*, 558 F.3d at 735. The defendants are entitled to summary judgment on the failure to train and supervise claims.

### B.     *Failure to Exhaust Administrative Remedies*

Alternatively, the defendants argue that they are entitled to judgment as a matter of law on all the claims because Hildreth did not properly exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA). Doc. 139-1 at 27-29. The defendants note that the Jail's grievance procedure has two steps. *Id.* at 27-28. First, the inmate must file a grievance. *Id.* at 28. Then, if the inmate is dissatisfied after receiving a response, the inmate must appeal to the Chief Deputy. *Id.* The defendants argue that although Hildreth filed grievances, he did not administratively exhaust because he "has not established (and does not even claim) that he ever submitted an appeal to the Chief Deputy with respect to any one [of] his many grievances." *Id.*

Hildreth does not claim he submitted an appeal to the Chief Deputy. Doc. 147 at 13. Instead, he argues:

> While the Jail raises exhaustion, it should be noted that its policies in this regard were rarely properly enforced. In fact, merely designating

28

something as an "APPEAL" could get it seen. There is nothing in the record that shows they went to the chief deputy.

*Id.* In response, the defendants argue that Hildreth has not shown evidence that he complied with the exhaustion requirement, evidence that the defendants waived the requirements or case law justifying his failure to exhaust. Doc. 153 at 1.

Under the PLRA, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Prisoner is defined as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h). The mandatory exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (internal quotations and citations omitted). This exhaustion requirement applies regardless of whether administrative procedures provide the prisoner relief. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

If a claim has not been exhausted, the PLRA requires dismissal. *Porter v. Sturm*, 781 F.3d 448, 452 (8th Cir. 2015). A court cannot excuse a prisoner's failure to exhaust administrative remedies. *Ross v. Blake*, 578 U.S. 632, 638 (2016). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). This includes adhering to deadlines set forth in the institution's grievance procedure. *Ngo*, 548 U.S. at 93-95. The Eighth Circuit has "only excused inmates from complying

29

with an institution's grievance procedures when officials have prevented prisoners from utilizing the procedures or when officials themselves have failed to comply with the grievance procedures." *Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) (citations omitted). The Eighth Circuit has stated that "the district court must look to the time of filing, not the time the district court is rendering its decision, to determine if exhaustion has occurred. If exhaustion was not completed at the time of filing, dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). "Nonexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Sturm*, 781 F.3d at 451.

Hildreth remains incarcerated and thus subject to the PLRA. The defendants have raised exhaustion and have shown Hildreth failed to exhaust because he did not use all available steps of the Jail's grievance procedure. The procedure contains two steps: (1) the inmate can file a grievance and (2) if the inmate is dissatisfied with the response to the grievance, the inmate can appeal to the Chief Deputy within seven days of the response. Doc. 138-1 at 11 ¶¶ 62-63; Doc. 138-2 at 76. Records kept by the defendants show that Hildreth never directed an appeal to the Chief Deputy. Doc. 138-1 at 11 ¶¶ 64-66. Indeed, as the defendants note, Hildreth has not even claimed "that he ever submitted an appeal to the Chief Deputy with respect to any one [of] his many grievances." Doc. 139-1 at 28.

Hildreth argues that he has properly exhausted because he submitted complaints to the Iowa Office of Ombudsman and labelled grievances as appeals. Doc. 147-2 at 16; Doc. 149 at 9 ¶ 61. But the grievance procedure required that he submit his appeal to the Chief Deputy. Doc. 138-1 at 11 ¶¶ 62; Doc. 138-2 at 75-76. The procedure did not provide that an inmate could administratively exhaust by complaining to an outside entity. *Id.* Therefore, his complaints to the Ombudsman did not exhaust his claims.

Regarding Hildreth's claim that he appealed, the two grievances that he labelled as appeals did not administratively exhaust any grievance. Indeed, Hildreth does not address which, if any, of his present claims were allegedly exhausted by the documents

30

he labelled as appeals. *See* Doc. 149 at 9 ¶ 61. I will address his September 11, 2021, and December 16, 2021, appeals in turn.

Hildreth labelled the September 11, 2021, grievance as an appeal, but it did not reference another grievance and its context shows that it was an initial grievance. Doc. 147-2 at 82. Hildreth accused the Jail of not giving him his mail, including legal mail, an accusation that is unrelated to his mail claim that the Jail was opening his legal mail outside his presence. *Id.* Even if the two were related, he filed his grievance about Jail staff opening his mail in November, meaning the September "appeal" could not have been an appeal addressing the later-filed grievance. *See* Doc. 138-1 at 5 ¶ 20. Additionally, Fieler responded rather than the Chief Deputy (who exclusively responds to appeals), further supporting that it was an initial grievance. Doc. 147-2 at 82; Doc. 138-2 at 76.

The December 16, 2021, appeal also failed to exhaust any of Hildreth's current claims. It refers to "7-23-21 and 8-02-21," dates that are well beyond the seven-day window to timely appeal grievances. Doc. 138-2 at 76. The second part of the December 16, 2021, appeal contests a December 12, 2021, response to a grievance Hildreth filed on December 11, 2021. Doc. 147-1 at 81. As noted above, it appears that this appeal addressed his December 11, 2021, disciplinary violation for helping an inmate send text messages on a third inmate's account. *See* Doc. 138-1 at 4 ¶ 16(e). Hildreth has not attempted to demonstrate which claim this appeal allegedly exhausted, nor has he argued that this discipline violation is relevant to his retaliation claim. I cannot find that these appeals exhausted any of his claims.

Finally, Hildreth has not created a genuine dispute of material fact that Jail officials prevented him from exhausting his claims. In his pro se complaint (Doc. 1-1), Hildreth claims that he did not file additional grievances because he feared retaliation.[24] *Id.* at 11. He also claims twice that he wrote to the Ombudsman because he did not receive a

---

[24] He does not identify the claims to which these grievances would have related. Doc. 1-1 at 11.

response to his grievances, including those regarding the July 22, 2021, incident. *Id.* at 11, 17. However, the documents submitted with his resistance do not address or support these conclusory statements with evidence. *See* Docs. 147, 147-1, 147-2, 149. "[A] plaintiff must present some evidence, other than mere conclusory statements, to demonstrate that he was precluded from fully exhausting his administrative remedies." *Gisege v. Minn. Dep't. of Corr.,* No. 06-cv-1353, 2007 WL 2892024 at *11 (D. Minn. Sept. 28, 2007). Hildreth has failed to do so.

Hildreth's claims fail on their merits as a matter of law and, in any event, he failed to exhaust any of those claims as required by the PLRA. As such, I need not address the defendants' qualified immunity arguments. I note, however, that Hildreth failed to address those arguments in his resistance. Doc. 147.

## VI. CONCLUSION

For the reasons set forth herein:

1. The defendants' motion (Doc. 138) for summary judgment is **granted in its** entirety. All claims asserted in this case by plaintiff Marvin Hildreth are **dismissed with prejudice.**

2. Judgment **shall enter** against plaintiff Marvin Hildreth and in favor of the defendants.

3. The Clerk of Court shall **close this case.**

**IT IS SO ORDERED** this 21st day of April, 2026.

_____
Leonard T. Strand
United States District Judge

32